UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
————————————————————————x

S.H. on behalf of her minor child, W.H.,

        Plaintiff


     -against-                                  <u>OPINION AND ORDER</u>
                                                       10 CV 03927 (KMW)


EASTCHESTER UNION
FREE SCHOOL DISTRICT,

           Defendant.
————————————————————————x


KIMBA M. WOOD, U.S.D.J.:



**I. Introduction**

       Plaintiff S.H., on behalf of her minor child, student W.H., brings this action against

Defendant Eastchester Union Free School District ("the District") seeking relief under the

Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 et seq.  Both parties

have moved for summary judgment.

       S.H. seeks reversal of the decision of the State Review Officer for the New York State

Department of Education ("SRO"), who affirmed the Impartial Hearing Officer's ("IHO")

determination that S.H. is not entitled to tuition reimbursement for the unilateral placement of

W.H. at a private residential school for the 2008-09 academic year.  For the reasons set forth

below, the District's motion for summary judgment is granted and S.H.'s motion for summary

judgment is denied.

1

## II. Overview of Applicable Law

The IDEA mandates that a child with a disability receive a free appropriate education, including special education and related services, provided at the public expense, and in conformity with an Individualized Education Program ("IEP"). *See* 20 U.S.C. § 1400(d)(1)(A); 20 U.S.C. § 1401(9); *M.P.G. ex rel. J.P. v. New York City Dep't of Educ.*, No. 08 Civ. 8051, 2010 WL 3398256, at *1 (S.D.N.Y. Aug. 27, 2010) (Griesa, J.).   A school district provides a free appropriate education to a child with a disability when the child's educational program is tailored to meet that child's unique needs and is "reasonably calculated to enable the child to receive educational benefits." *Bd. of Educ. v. Rowley*, 458 U.S. 176, 206-07 (1982).  The school district must provide that educational program in the least restrictive environment.  20 U.S.C. § 1412(a)(5).

The central mechanism of the IDEA is the IEP, "an educational program tailored to provide appropriate educational benefits to individual disabled students."  *Viola v. Arlington Cent. Sch. Dist.*, 414 F. Supp. 2d 366, 377 (S.D.N.Y. 2006) (Conner, J.) (internal quotations omitted).  Pursuant to the IDEA, a written IEP must state: "(1) the child's present level of educational performance; (2) the annual goals for the child, including short-term instructional objectives; (3) the specific educational services to be provided to the child, and the extent to which the child will be able to participate in regular educational programs; (4) the transition services needed for a child as he or she begins to leave a school setting; (5) the projected initiation date and duration for proposed services; and (6) objective criteria and evaluation procedures and schedules for determining, on at least an annual basis, whether instructional objectives are being achieved."  *Id.*, citing 20 U.S.C. § 1414(d)(4)(A)(i).

2

Parents who are dissatisfied with a school district's proposed program may unilaterally place their child in a private school and then seek retroactive tuition reimbursement from the local school district.  *See* 20 U.S.C. 1412 (a)(10)(c); *M.P.G.*, 2010 WL 3398256, at \*2.  The District is required to reimburse parents if all three factors of the *Burlington-Carter* test are met: (1) the district's recommended educational program was inadequate or insufficient; (2) the program selected by the parents was appropriate; and (3) the equities support the parents' claim. *M.P.G.*, 2010 WL 3398256, at \*2 (citing *Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359, 369-70 (1985)); *see also Florence Cnty. Sch. Dist. Four v. Carter*, 510 U.S. 7 (1993).  In addressing the first factor, a court considers (1) whether the student's IEP was developed according to the IDEA's procedural requirements, and (2) whether the educational plan set forth in the IEP was reasonably calculated to confer educational benefit on the student.  *M.P.G.*, 2010 WL 3398256, at \*2.  If a court determines that the district's proposed IEP is appropriate, it need not address the second and third factors.  *Id.*

Parents who are dissatisfied with the district's proposed IEP may contest it at an impartial due process hearing in front of an IHO.  *See* 20 U.S.C. § 1415(f).  The IHO's decision "may be appealed to the state educational agency…, and the state educational agency's decision may in turn be appealed in either state or federal court…."  *Viola*, 414 F. Supp. 2d at 377.

### III. Facts[1]

#### a. Background[2]

W.H. was born in the Czech Republic on October 23, 1993, and was adopted there by S.H. when he was eighteen months old.  (Plaintiff's Rule 56.1 Statement ("Pl.'s 56.1") ¶¶ 1, 4; Defendant's Rule 56.1 Statement ("Def.'s 56.1") ¶ 10.)  W.H. was educated in the Czech Republic through third grade, at which time S.H. moved to Eastchester, New York with W.H. (Def.'s 56.1 ¶¶ 12-14.)  When W.H. began attending school in the District in fourth grade, he displayed behavior indicating that he was struggling both emotionally and academically.  (Pl.'s 56.1 ¶ 7.)

In December of 2003, W.H. began to see a private psychiatrist who prescribed medication for him.  (Def.'s 56.1. ¶ 15; Pl.'s 56.1 ¶ 8.)  W.H. continued to be educated within the District in fifth grade, and he continued to struggle academically.  (Pl.'s 56.1 ¶ 11.)  In March of 2005, during fifth grade, W.H. was hospitalized at Four Winds Hospital ("Four Winds").  (Def.'s 56.1 ¶ 17.)  At Four Winds, a Psychodiagnostic Evaluation was performed.  (*Id.* ¶ 18; Dist. Ex. 9.)  The evaluation indicated that W.H. fell within the average range of intellectual functioning and within the low average range of selective attention; his command of rules and procedures of arithmetic was at the sixth-grade level; his spelling skills were at the second-grade level; and both reading and arithmetic skills were within the average range.  (Def.'s 56.1 ¶¶ 19-21; Dist. Ex. 9.)  The evaluation indicated that emotionally W.H. has "little ability to constructively

---

[1] The following facts are taken from Plaintiff's Rule 56.1 Statement, Defendant's 56.1 Response, Defendant's Rule 56.1 Statement, Plaintiff's 56.1 Response, and the Administrative Record, which includes the transcripts of the impartial due process hearing and exhibits offered by both parties.  Unless otherwise noted, all facts relied upon are uncontested.

[2] Only the 2008-09 school year is at issue in the instant action; however, the Court provides a more extensive background in order to contextualize the present dispute.

4

process or adaptively express his feelings," and that he is "a psychologically immature individual with very limited coping resources, who is likely to react to even ordinary levels of psychological stress with symptoms including both impulsivity and emotional distress."  (Def.'s 56.1 ¶ 22; Dist. Ex. 9 at 7.)

At the end of fifth grade, W.H. was referred to the District's Committee on Special Education ("CSE") and was found eligible for special education and related services with a classification of "emotional disability."  (Pl.'s 56.1 ¶ 12; Def.'s 56.1 ¶ 27.)

In November of 2007, Westchester Jewish Community Services conducted a Forensic Mental Health Evaluation of W.H. (Def.'s 56.1 ¶ 31; Dist. Ex. 10.)  The evaluator identified the following diagnoses: Reactive Attachment Disorder, Attention Deficit Hyperactivity Disorder, Oppositional Defiant Disorder, Learning Disorder Not Otherwise Specified ("NOS"), Impulse Control Disorder NOS, and Depressive Disorder NOS.  (Def.'s 56.1 ¶ 35; Dist. Ex. 10 at 7.)  The evaluator concluded that because of W.H.'s attachment difficulties, "placing [W.H.] in a residential facility would likely exacerbate his sense of loneliness and interpersonal ambivalence. As such, it is recommended that [W.H.] be placed under the supervision of the probation department."  (Dist. Ex. 10 at 8.)

W.H. began the 2007-08 school year (eighth grade) at the District's middle school, but sometime in the fall, the school and S.H. became aware that W.H. had threatened to stab the assistant principal.  (Pl.'s 56.1 ¶ 23; Def.'s 56.1 ¶¶ 38, 40.)  Thereafter, a state court removed W.H. from the middle school and placed him at Children's Village, a non-secure detention center, where he stayed for five weeks.  (Pl.'s 56.1 ¶ 24; Def.'s 56.1 ¶ 41.)  A Psychiatric Evaluation Report was prepared while he was at Children's Village.  (Def.'s 56.1 ¶ 46; Dist. Ex. 12.)  This evaluation recommended that W.H.'s probation be extended, that he should be

5

supervised in the community rather than in a residential placement facility because the latter would only further W.H.'s feelings of estrangement and alienation, and that he should be placed in a highly structured academic environment such as a therapeutic support program.  (Def.'s 56.1 ¶ 48; Dist. Ex. 12 at 4.)

After his discharge from Children's Village, W.H. was provided home tutoring by the District until the CSE could recommend and secure a placement for him.  (Def.'s 56.1 ¶¶ 43, 45.) When the CSE met on January 25, 2008, it recommended that W.H. be placed at Southern Westchester Collaborative High School ("CHS").  (Dist. Ex. 26.)  CHS is a Regents-track, full-day alternative high school and therapeutic support program for up to thirty-two classified and nonclassified students.  (Def.'s 56.1 ¶ 50.)  CHS is designed for students who have emotional and/or social disabilities that impact their academic performance in a regular high school environment.  (Id.  ¶ 55.)  The core academic classes - science, English, math, and history - are all staffed by both a special education teacher and a teaching assistant.  (Id. ¶ 57.)

On March 11, 2008, W.H. began attending CHS.  (Def.'s 56.1 ¶ 51.)  On March 14, 2008, the CSE convened to plan a program for the remainder of the 2007-08 school year.  (Def.'s 56.1 ¶ 52; Mar. 14, 2008 IEP ("Dist. Ex. 3").)  At this meeting, the CSE recommended continued placement at CHS, a special class program with a student-to-teacher ratio of 12:1 with related services of weekly individual counseling sessions, monthly psychiatric consultations, weekly group counseling sessions, and weekly math tutoring.  (Def.'s 56.1 ¶ 53; Dist. Ex. 3 at 1.)

On June 20, 2008, prior to the conclusion of the 2007-08 school year, S.H. removed W.H. from CHS and placed him in the Anasazi Foundation ("Anasazi") wilderness program in Mesa, Arizona.  (Def.'s 56.1 ¶ 87; Pl.'s 56.1 ¶ 29.)

6

**b. The 2008-09 School Year**

On June 6, 2008, the CSE reconvened to plan W.H.'s 2008-09 program.  The CSE recommended that W.H. continue the program at CHS, including classes of no more than twelve students, weekly individual and group counseling, a monthly psychiatric consultation, and two hours of math tutoring per week.   (Pl.'s 56.1 ¶ 30; Def.'s 56.1 ¶ 115; June 6, 2008 IEP ("Dist. Ex. 4") at 1.)  The CSE also recommended the preparation of a functional behavioral assessment in September 2009, the implementation of a behavior intervention plan at the beginning of the 2008-09 school year, various testing and program accommodations, and access to a computer for assistive technology.  (Def.'s 56.1 ¶¶ 113, 116; Dist. Ex. 4 at 2, 5.)  The CSE developed goals to address W.H.'s math, writing, and study skills, and his social emotional needs.  (Def.'s 56.1 ¶ 114; Dist. Ex. 4 at 5-8.)

On June 16, 2008, S.H. wrote a letter to the District's Director of Staff and Pupil Services and the Chairperson for the June 6, 2008 CSE meeting, Ms. Urso, rejecting the District's proposed program because she felt W.H. needed a twelve-month therapeutic residential program in order to make educational progress.  (Def.'s 56.1 ¶ 120; Dist. Ex. 4-A.)

In a letter to the CSE dated July 20, 2008, S.H. again objected to the program because she beleived W.H. did not make academic progress while at CHS, CHS allowed students too much freedom of movement off campus, and that W.H. used illegal substances with other students attending CHS.  (Dist. Ex. 7.)  S.H. notified the CSE that the therapist at the Anasazi wilderness program recommended that W.H. go directly to a residential placement facility that could meet his emotional and academic needs.  (*Id.*)

S.H. requested a CSE meeting upon W.H.'s discharge from the wilderness program.  On August 6, 2008, the CSE reconvened to review the program it had recommended for the 2008-09

school year.  The CSE considered the Four Winds Psychodiagnostic Evaluation ("Dist. Ex. 9"),

the Westchester Jewish Community Services Forensic Mental Health Evaluation ("Dist. Ex.

10"), the Psychiatric Evaluation Report prepared by Children's Village ("Dist. Ex. 12"), a Social

History Report prepared by the District and updated in January 2008 ("Dist. Ex. 11"), verbal and

written progress reports from W.H.'s teachers at CHS, W.H.'s report card from CHS, and a letter

dated July 25, 2008 from the Anasazi wilderness program ("Dist. Ex. 17").  (Def.'s 56.1 ¶ 126;

Aug. 6, 2008 IEP ("Dist. Ex. 8") at 6.)  The Anasazi letter recommended that W.H. be admitted

to a facility specializing in attachment disorders immediately upon discharge from the wilderness

program.  (Dist. Ex. 17.)  After reviewing this information, the CSE recommended the same

program as it had in June- placement at CHS with supplementary supports and services- with the

addition of a one-to-one aide.  (Def.'s 56.1 ¶ 132; Dist. Ex. 8 at 1.)  S.H. informed the District

that upon his discharge from the wilderness program, W.H. would begin to attend Change

Academy, a private residential facility that specializes in treating teenagers with attachment

disorders.  (Def.'s 56.1 ¶ 128; Pl.'s 56.1 ¶ 36.)

On October 23, 2008, the CSE reconvened in order to review additional documents

supplied by S.H. concerning W.H.  (Def.'s 56.1 ¶ 138; Pl.'s 56.1 ¶ 39.)  At this meeting, the CSE

again considered all the documents it had reviewed at the August 6, 2008 meeting, as well as a

letter from W.H.'s private psychiatrist ("Dist. Ex. 19"), a letter from W.H.'s private counselor

(Dist. Ex. 21), and a letter from Change Academy ("Dist. Ex. 20"),.  (Def.'s 56.1 ¶ 140; Oct. 23,

2008 IEP ("Dist. Ex. 18") at 5-6.)  Although the three letters opined that W.H. required a

residential placement, the CSE decided against altering its recommendations for W.H. for the

2008-09 school year.  (Def.'s 56.1 ¶ 144; Pl's 56.1 ¶ 51; Dist. Ex. 18 at 5.)

On November 10, 2008, S.H. requested a hearing before an IHO for the purpose of obtaining tuition reimbursement for the 2008-09 school year.  (Dist. Ex. 1.)  Specifically, S.H. sought reimbursement for tuition and room and board at Change Academy, as well as reimbursement for other related educational expenses and services that she provided for the 2008-09 school year.  (*Id*.)

### c. The IHO's Decision

An impartial hearing was held over a five-day period.   On October 20, 2009, the IHO issued a decision in favor of the District, concluding that the District offered W.H. a free appropriate public education in the least restrictive environment for the 2008-09 school year. After reviewing the testimony from witnesses for both parties, the IHO concluded that a preponderance of the evidence showed that the 2008-09 IEPs were procedurally and substantively adequate.  The IHO found that there were no procedural errors during the development of the 2008-09 IEP that would impede W.H.'s right to a free appropriate public education, and that the proposed program for the 2008-09 school year was substantively adequate because it was likely to produce progress and offered an appropriate education in the least restrictive environment.  (IHO Decision at 46, 50).  The IHO noted that the goals developed by the CSE were designed to specifically address W.H.'s academic and emotional needs, and that there was evidence of W.H. making both social and academic process while he was attending CHS.  (*Id*. at 50).  Finally, the IHO independently found that a residential placement would be too restrictive.  (*Id*. at 45, 48, 51).

### d. The SRO's Decision

S.H. appealed the IHO's decision to the SRO.  On January 15, 2010, the SRO issued a decision finding that the District offered W.H. a free appropriate education in the least restrictive

environment for the 2008-09 school year.  The SRO noted that the hearing record supported the IHO's conclusion that there were no procedural deficiencies surrounding the creation of the IEP that resulted in a denial of a free appropriate education.  The SRO further found that the program recommended by the District for the 2008-09 school year was reasonably calculated to confer educational benefit to W.H.  (SRO Decision at 19-20).

### e. Issues Raised on Appeal

S.H. then filed the instant action to appeal the SRO's determination that she is not entitled to tuition reimbursement for the unilateral placement of W.H. at Change Academy for the 2008-09 school year.  S.H. contends that the District failed to comply with the IDEA's procedural requirements by failing to have the required participants at the CSE meetings, failing to include appropriate goals in the IEP, and failing to prepare a functional behavioral assessment. S.H. argues that these procedural violations denied W.H. a free appropriate education. (Plaintiff's Memorandum of Law in Support of her Motion for Summary Judgment ("Pl.'s Memo.") at 3-6.)  S.H. also argues that the proposed IEP is substantively inadequate because placement at CHS was not reasonably calculated to produce educational progress due to the nature and severity of W.H.'s disability.  (Id. at 7-10.)

The District maintains that the 2008-09 IEP is not procedurally defective because the CSE included all the required participants and appropriately recommended that a functional behavioral assessment be completed at the start of the 2008-09 school year.  (Defendant's Memorandum of Law in Support of its Motion for Summary Judgment ("Def.'s Memo.") at 4-8.) The District also maintains that the IEP was reasonably calculated to provide W.H. with educational benefit in the least restrictive environment because its goals addressed W.H.'s social

and emotional needs and his academic deficits, and the CSE appropriately found that W.H. did

not need a residential placement in order to make meaningful educational progress.  (*Id.* at 8-17.)

**IV. Standard of Review**

When reviewing administrative determinations under the IDEA, federal courts must

consider the record from the administrative proceedings as well as additional evidence presented

by the parties, and determine whether compliance with the IDEA has been shown by a

preponderance of the evidence.  *See* 20 U.S.C. § 1415(i)(2)(C); *J.G. v. Briarcliff Manor Union*

*Free Sch. Dist.*, 682 F.Supp.2d 387, 392 (S.D.N.Y. 2010) (Young, J.).  Although the parties have

submitted motions for summary judgment, "the procedure is in substance an appeal from an

administrative determination."  *M.P.G.*, 2010 WL 3398256, at *7.

The standard to be applied by the district  court has been characterized as a "modified de

novo" review.  *E.S. ex rel. B.S. v. Katonah-Lewisboro Sch. Dist.*, 742 F. Supp. 2d 417, 424

(S.D.N.Y. 2010) (Preska, J.).  "For a federal court to conduct an independent review of a

challenged IEP without impermissibly meddling in state educational methodology, it must

examine the record for any objective evidence indicating whether the child is likely to make

progress or regress under the proposed plan."  *E.H. v. Bd. of Educ. of the Shenendehowa Cent.*

*Sch. Dist.*, No. 05 Civ. 972, 2008 WL 3930028, at *8 (N.D.N.Y. Aug. 21, 2008) (Sharpe, J.)

(internal quotations omitted).  The district court must give "due weight" to the administrative

proceedings' determination of whether a challenged IEP will provide a child with an appropriate

public education, and be "mindful that the judiciary lacks the specialized knowledge and

experience necessary to resolve persistent and difficult questions of educational policy."  *A.C. ex*

*rel. M.C.v. Bd. of Educ. of the Chappaqua Cent. Sch. Dist.*, 553 F.3d 165, 171 (2d Cir. 2009).

While a district court should not simply "rubber stamp" decisions made in administrative

proceedings, it is expected to give deference to those proceedings, particularly when the state

officers' decisions are thorough and careful.  *See Walczak v. Florida Union Free Sch. Dist.*, 142

F.3d 119, 129 (2d Cir. 1998).

## V. Analysis

### a. Procedural Compliance

The IDEA mandates a framework for developing a student's educational plan.  *See* 20

U.S.C. § 1414.  A student's IEP and personalized instruction should be formulated in accordance

with the requirements of the Act.  *Rowley*, 458 U.S. at 203-04.  Not every failure to conform to

the procedural requirements will render an IEP insufficient.  *See Grim v. Rhinebeck Cent. Sch.*

*Dist.*, 346 F.3d 377, 381 (2d Cir. 2003).  A procedural error will cause an IEP to be legally

inadequate "only when the procedural error deprives a student of his or her right to a free

appropriate education."  *M.C. v. Rye Neck Union Free Sch. Dist.*, No. 06 Civ. 3898, 2008 WL

4449338, at *11(S.D.N.Y. Sept. 29, 2008) (Seibel, J.) (internal quotations omitted).  Specifically,

a procedural error results in a denial of a free appropriate education when the procedural

deficiency "(1) impeded the child's right to a free appropriate public education, (2) significantly

impeded the parents' opportunity to participate in the decision making process regarding the

provision of a free appropriate public education, or (3) caused a deprivation of educational

benefits."  *A. H. ex rel. J.H. v. Dep't of Educ. of the City of New York*, 394 Fed. Appx. 718, 720

(2d Cir. 2010) (citing 20 U.S.C. § 1415(f)(3)(E)(ii)).  Here, S.H. alleges three procedural errors

that she argues render the 2008-09 IEP legally insufficient: (1) the District's failure to have all

required participants present at the CSE meetings; (2) the CSE's failure to include appropriate

goals in the IEP; and (3) the District's failure to prepare a functional behavioral assessment and implement a behavioral plan.[3]

### 1. Composition of the CSE

S.H. argues that W.H. was denied a free appropriate education when neither his treating professionals nor anyone from Change Academy participated in the October 23, 2008 CSE meeting.  (Pl.'s Memo. at 4.)  State regulations provide that "not less than one special education teacher of the student, or, if appropriate, not less than one special education provider of the student" attend the CSE meeting.  8 NYCRR 200.3(a)(1)(iii).  The SRO found that although no one from Change Academy or any of the student's treating professionals took part in the October 2008 CSE subcommittee meeting, "the hearing record establishes that the October 23, 2008 CSE was composed of individuals, including district staff and representatives from the county and probation department, who were familiar with the student and his academic and behavioral history."  (SRO Decision at 20).

The Court finds that the SRO's determination is supported by a preponderance of the evidence in the administrative record.  The October 23, 2008 IEP reflects that a special education teacher from CHS attended the meeting.  (Dist. Ex. 18 at 5.)   In fact, this special education teacher, who taught W.H. while he was at CHS, was present at each CSE meeting.  (Dist. Ex. 4 at 4-5; Dist. Ex. 8 at 5; Dist Ex. 18 at 5; Impartial Hearing Transcript ("Tr.") 190, 212, 236.) The October 23, 2008 CSE meeting was attended by individuals who knew W.H., had worked

---

[3] S.H. also argues that the District failed to implement the 2007-08 IEP by not fully implementing the recommendation for individual counseling. (Pl.'s Memo. at 5-6.)  Because the administrative proceeding under review does not contain a claim with respect to the 2007-08 school year, the Court need not address this contention. Even if the implementation was at issue, the Court agrees with the SRO's finding that the record shows that W.H. made social and emotional progress as a result of the strategies developed and utilized by the staff at CHS, despite the fact that W.H. did not receive all of his regularly scheduled counseling sessions.

with him in school or in the community, and could contribute the information necessary for the CSE to address W.H.'s educational and therapeutic needs.  *See A.H.*, 394 Fed. Appx. at 720 (finding that the absence of a special education teacher from the CSE meeting did not result in the denial of educational benefits when a "certified special education teacher who taught and served as IEP coordinator" attended, and there was no evidence that this teacher "in any way lacked knowledge regarding the special education program options for the student.").

The CSE convened the October 23, 2008 meeting for the purpose of reviewing progress reports from Change Academy and letters from W.H.'s private therapist and private psychiatrist. (Tr. 80-86.)   Although no one from Change Academy was present at the CSE meeting, the committee had input from Change Academy in the form of a letter from the Academy's chief executive officer.  (Dist. Ex. 20.)  There is nothing in the record to suggest that the absence from the October 23, 2008 CSE meeting of a participant either from Change Academy or from among W.H.'s treating professionals (1) impeded W.H.'s right to a free appropriate education, (2) significantly impeded S.H.'s opportunity to participate in the decision-making process regarding the provision of a free appropriate education, or (3) caused a deprivation of educational benefits. 20 U.S.C. § 1415(f)(3)(E)(ii).

## 2.   Appropriateness of Goals in the IEP

S.H. argues that the goals and objectives in the IEP fail to appropriately address W.H.'s needs.  Specifically, S.H. contends that the August and October 2008 IEPs contain no spelling or reading goals, even though the IEPs demonstrate that W.H. had significant deficits in those areas.

(Pl.'s Memo. at 5.)   The SRO found that the annual goals in the IEPs were appropriate to meet W.H.'s needs.  (SRO Decision at 22).[4]

The IDEA requires that the student's IEP include a statement of measurable annual goals, including academic and functional goals, designed to meet the child's needs.  20 U.S.C. § 1414(d)(1)(A)(i).  Each annual goal shall include the evaluative criteria, evaluation procedures, and schedules to be used to measure progress toward meeting that goal.  *Id*.

At the impartial hearing, the Director of Pupil Personnel Services for the District agreed with S.H. that W.H. still needed help in spelling and reading, but testified that the IEP appropriately addressed these needs by incorporating reading and writing goals.  (Tr. 70: 23.) She specifically pointed to the fifth goal, that W.H. "will submit a written assignment on a topic requested by the teacher consisting of at least four paragraphs with complete sentences" as a goal designed to address W.H.'s difficulty with spelling.  (Tr. 71.)  She went on to testify that the goal for W.H. to write four paragraphs and employ strategies to organize his writing is a "good intervention for someone who has some difficulty in the area of reading and writing."  (Tr. 71: 21-23.)

Additionally, the principal of CHS testified as to the appropriateness of the reading and writing goals, and specifically noted that the goal that W.H. will independently complete reading and writing assignments was an appropriate one because W.H. "had the ability to independently complete reading and writing assignments."  (Tr. 189: 18-20.)

The Court agrees with the SRO's determination that the administrative record demonstrates that the goals in the challenged IEP were appropriate to meet W.H.'s needs and

---

[4] The goals included in the June 6, 2008, August 6, 2008, and October 23, 2008 IEPs are the same in each IEP.

provided sufficient specificity to enable the student's teachers and related service providers to understand the CSE's expectations with respect to each goal for the 2008-09 school year.  (SRO Decision at 22).

### 3.   Functional Behavioral Assessment

S.H. argues that the District's failure to prepare a functional behavioral assessment for W.H. resulted in a denial of a free appropriate education.  The SRO found that the District's failure to conduct this assessment did not rise to the level of a denial of a free appropriate education, because W.H. benefitted from strategies developed by the CHS staff.  (SRO Decision at 25).

The IDEA requires that in the case of a child "whose behavior impedes the child's learning or that of others," the CSE team "consider the use of positive behavioral interventions and supports, and other strategies, to address that behavior." 20 U.S.C. § 1414(d)(3)(B)(i). "Under New York law, the school district must conduct [a functional behavioral assessment] in developing an IEP 'for a student whose behavior impedes his or her learning or that of others, as necessary to ascertain the physical, mental, behavioral and emotional factors which contribute to the suspected disabilities.'" *Connor ex rel. I.C. v. New York City Dep't of Educ.*, No. 08 Civ. 7710, 2009 WL 3335760, at *4 (S.D.N.Y. Oct. 13, 2009) (Sand, J.) (citing 8 N.Y.C.R.R. § 200.4(b)(1)(v).  Courts have found that IEPs without functional behavior assessments were appropriate when those IEPs contained goals and strategies to address the student's behavior. *See T.Y. v. New York City Dep't of Educ.*, 584 F.3d 412, 419 (2d Cir. 2009); *A.C.*, 553 F.3d at 172-73.  The IDEA requires deference to the expertise of the administrative agency in determining the sufficiency of goals and strategies.  *Grim*, 346 F.3d at 382.

16

The Court finds that the District's failure to conduct a functional behavioral assessment did not result in a denial of a free appropriate education.  All three 2008 IEPs indicate that a functional behavioral assessment would be conducted and a behavioral plan would be implemented at the beginning of the 2008-09 school year.  (Dist. Exs. 4 at 5; 8 at 2; 18 at 2.)  The principal of CHS testified that a functional behavioral assessment was not prepared for W.H. in the three months that he attended CHS in the spring of 2008 because the CSE team "wanted to give [W.H.] an opportunity to be there and to acclimate to the program."  (Tr. 235-36.)

The administrative record shows that the CHS staff generated strategies to address W.H.'s behavior, and that the teachers saw positive results from the implementation of these strategies.  (Tr. 236.)  The record also reveals that CHS had its own behavior plan and procedures in place, including the recommendation of a 1:1 aide for the 2008-09 school year. The CSE team recommended a functional behavioral assessment to be conducted in the 2008-09 school year because it wanted to design an even more specific approach, not because the plan in place was deficient.  (Tr. 61.)  Finally, demonstrating attention to W.H.'s individual behavioral needs, the IEP listed goals that addressed social, emotional, and behavior concerns, and it delineated practices for W.H. to employ to improve in these areas.  (Dist. Exs. 4 at 7; 8 at 8-9; 18 at 7-8.)

Courts have been willing to overlook the absence of a functional behavioral assessment in instances where the IEP contains alternative ways to address a student's behavioral needs.  *See C.T. v. Croton-Harmon Union Free Sch. Dist.*, No. 10 Civ. 1624, 2011 WL 2946706, at *9 (S.D.N.Y. Jul. 18, 2011) (Jones, J.) (finding that lack of a functional behavioral assessment did not result in a denial of a free appropriate education because the IEP contained numerous strategies that showed the committee considered the student's behavioral needs); *M.H. v. New*

*York City Dep't of Educ.*, 712 F.Supp.2d 125, 159, (S.D.N.Y. 2010) (Preska, J.) (finding that despite the lack of a functional behavioral assessment, the IEP was not procedurally deficient when it provided for the management of the student's behaviors).

In light of the above, the Court agrees with the SRO that the administrative record supports a finding that the failure to conduct a functional behavioral assessment for W.H. did not result in a denial of a free appropriate education.  The goals and strategies employed by CHS were adequate to address W.H.'s needs such that a functional behavioral assessment was not necessary for the CSE team to plan an appropriate program for the 2008-09 school year.

### b. Substantive Compliance

S.H. also challenges the substantive adequacy of the IEPs.  Specifically, she argues that the recommended placement, CHS, was not reasonably calculated to produce educational progress because (1) the school lacked personnel trained in attachment disorders, (2) the frequency of counseling recommended was inadequate, and (3) W.H. required a residential placement.  (Pl.'s Memo. at 7.)  The SRO found that the IEPs accurately reflected W.H.'s needs, and the District's recommended program (and placement) was reasonably calculated to confer educational benefit to W.H. in the least restrictive environment.  (SRO Decision at 29).

The "IDEA does not require that an IEP furnish every special service necessary to maximize each handicapped child's potential.  Rather, a school district fulfills its substantive obligations under the IDEA if it provides an IEP that is likely to produce progress, not regression, and if the IEP affords the student with an opportunity greater than mere trivial advancement."  *A.H.* at 721 (internal citations and quotations omitted).

Although past progress is not dispositive, it does "strongly suggest that" an IEP modeled on a prior one that generated some progress was "reasonably calculated to continue that trend."

*Thompson R2-J Sch. Dist. v. Luke P. ex rel. Jeff P.*, 540 F.3d 1143, 1153 (10th Cir. 2008).  *See also D.D-s. v. Southold Union Free Sch .Dist.*, No. 09 Civ. 5026, 2011 WL 3919040, at *12 (E.D.N.Y. Sept. 2, 2011) (Seybert, J.) (determining that evidence of likely progress was "the fact that the [challenged IEP] was similar to a prior IEP that generated some progress"); *J.G. ex rel. N.G. v. Kiryas Joel Union Free Sch. Dist.*, 777 F. Supp. 2d 606, 650 (S.D.N.Y. 2011) (Young, J.) (finding that when the student made some progress under a previous IEP, it was not unreasonable for the CSE to propose an IEP "virtually identical to" the previous one); *M.C.*, 2008 WL 4449338, at *16 (determining that when the IEP at issue mirrored a past IEP under which the student "demonstrated significant progress," the IEP at issue was reasonably calculated to afford the student educational benefit).

The Court finds that a preponderance of the evidence in the administrative record reflects that W.H. made academic, social, and emotional progress while at CHS, and that the District's proposed program and placement for the 2008-09 school year was likely to produce progress, not regression.

W.H. made some progress while at CHS in the 2007-08 school year.  Notes from the June 6, 2008 CSE meeting show that although W.H. was not completing much school work, he was coming to school on time every day, forming relationships with staff and peers, and making emotional and behavioral progress.  (Tr. 45-50l; Dist. Ex. 4 at 5.)  W.H.'s social worker at CHS testified that W.H. had become more comfortable at CHS by June, was more social, and was interacting with his teachers more frequently than he had when he first enrolled.  (Tr. 246.) W.H.'s English teacher at CHS testified that she observed him staying after class talking with other students.  (Tr. 184-185.)  In terms of academic progress, the August 2008 IEP reflected that W.H. passed five classes and would be given the opportunity to complete the work required to

pass his other classes.[5]  (Dist Ex. 8 at 5-6.)  *See also* Aug. 8, 2008 Memo ("Dist. Ex. 14");
W.H.'s CHS Report Card ("Dist. Ex.15").

The Court is mindful that "in assessing progress, deference to the SRO's decision is
particularly important because state administrative agencies have special expertise in
determining a student's progress."  *Pericelli v. Carmel Cent. Sch .Dist.*, No. 06 Civ. 2114, 2007
WL 465211, at *16 (S.D.N.Y. Feb. 9, 2007) (McMahon, J.).  The Court agrees with the SRO that
the record demonstrates that W.H. made educational progress at CHS.  That progress is
particularly significant in light of his abbreviated enrollment there.[6]  The Court also finds that the
evidence suggests that W.H. would have continued to progress under the 2008-09 IEPs.

The evidence of W.H.'s progress at CHS also belies S.H.'s claim that W.H. requires a
residential placement in order to be afforded educational benefit.  "While some children's
disabilities may indeed be so acute as to require that they be educated in residential facilities, it is
appropriate to proceed cautiously whenever considering such highly restrictive placements.
IDEA's preference is for disabled children to be educated in the least restrictive environment
capable of meeting their needs."  *Walczak*, 142 F.3d at 132.  In New York, placement in the least
restrictive environment is effected where "placement of students with disabilities in special
classes, separate schools or other removal from the regular educational environment occurs only
when the nature or severity of the disability is such that even with the use of supplementary aids
and services, education cannot be satisfactorily achieved."  8 N.Y.C.R.R. 200.1(cc).  This least

---

[5] W.H. did not remain at CHS until the end of the 2007-08 school year, so he did not have the opportunity to
complete his assignments.  The record shows that W.H. would have been afforded the chance to make up work from
the 2007-08 school year in the 2008-09 school year, and that he was expected to turn in that work, especially in light
of the expected assistance of the 1:1 aide that the IEP recommended.  (Dist. Ex. 14; Tr. 181.)

[6] W.H. attended CHS from March 11, 2008 until June 13, 2008.  (Def.'s 56.1 ¶ 78.)

restrictive placement must: (1) provide the special education needed to the student; (2) provide for education of the student with other students who do not have disabilities to the maximum extent appropriate; and (3) be as close as possible to the student's home. *Id.*

The Second Circuit has adopted a two-factor standard to determine whether an IEP places a student in the least restrictive environment. A court should consider (1) "whether education in a regular classroom, with the use of supplemental aids and services, can be achieved satisfactorily;" and, if not, then (2) "whether the school has mainstreamed the child to the maximum extent possible." *Mr. and Mrs. P. v. Newington Bd. of Educ.*, 546 F.3d 111, 120 (2d Cir. 2008).

The record supports the SRO's determination that, because W.H. was making progress at CHS, a more restrictive placement was not necessary. The evidence showed that W.H. was starting to grow socially and emotionally while at CHS, and that the strategies the CHS staff created to motivate W.H. academically had some success. (Tr. 87, 193.) The CSE felt there were more strategies and interventions that could be implemented at CHS prior to recommending a more restrictive placement. (Tr. 78-79.) The CSE considered other programs, including a residential placement, before determining that CHS was the least restrictive placement for W.H. (Tr. 49.) At the October 23, 2008 CSE meeting, the team looked at the letters from Change Academy staff and from two of W.H.'s private providers , all of whom recommended a residential placement , but ultimately determined that none of the information presented warranted the conclusion that the program at CHS was not appropriate. (Tr. 86; Dist. Ex. 18 at 5.) The CSE's decision is in accord with the IDEA's least restrictive environment preference. *See Walczak*, 142 F.3d at 132 ("It would violate IDEA's preference for the least restrictive

21

educational setting to move a child from a day program where she is making progress to a residential facility simply because the latter is thought to offer superior opportunities.").

S.H. also contends that the District's program is inappropriate because none of the CHS staff is trained to work specifically with students with attachment disorders. The proper inquiry is whether the staff is able to implement the IEP. *See L.K. v. Dep't of Educ. of the City of New York*, No. 09 Civ. 2266, 2011 WL 127063, at *11 (E.D.N.Y. Jan. 13, 2011) (Mauskopf, J.) (finding that even though teachers did not have specific training in a particular teaching technique in the student's plan, there was no indication that the teachers lacked training to adequately implement the IEP).

The evidence shows that the staff at CHS was qualified to adequately implement W.H.'s IEP. The CHS staff met weekly to discuss the school's students and the progress they were making. (Tr. 246-47.) The CHS staff created strategies to motivate W.H. academically. These strategies include giving W.H. more hands-on activities, laying out work and letting W.H. independently approach the work rather than confronting him with it, dividing tasks into manageable components, and giving break time in between tasks. (Tr. 192-93, 248.) W.H. experienced some success with these techniques: he started choosing and reading books in English class, and he began to complete some of the assignments that were left out for him. (Tr. 193-94.) This academic progress is in addition to the social, emotional, and behavioral progress already discussed.

To further support her claim that W.H. requires the constant support of a residential facility, S.H. argues that the counseling the IEP provided was insufficient. The Court finds that the administrative record does not support S.H.'s contention that the counseling services were inadequate to meet W.H.'s needs. In *W.T. & K.T. ex rel. J.T. v. Bd. of Educ. of Sch. Dist. of New*

*York City*, 716 F. Supp. 2d 270, 292-93 (S.D.N.Y. 2010) (Maas, J.), the court found that counseling services were not required to provide a student with a free appropriate education when the CSE team determined that the recommended placement "was sufficiently small enough to provide a therapeutic setting."  In the instant action, the evidence supports the SRO's finding that the 2008-09 IEP was reasonably calculated to confer educational benefit to W.H. in the least restrictive environment.  W.H.'s social worker at CHS testified that she was making progress working with him: by June of 2008, W.H. was more open and verbal, was smiling more often, and was increasing interaction with his teachers.  (Tr. 246.)  She also noted that he had built positive relationships with his peers.  (Tr. 250.)  In addition, the CSE chairperson testified that the recommended group therapy service for 30 minutes per week was appropriate because it is an integral component of treatment for children with emotional disabilities.  (Tr. 42-43.)  Also, the June 6, 2008 IEP indicated that the CHS principal informed S.H. that family counseling sessions could be incorporated into W.H.'s program.  (Dist. Ex. 4 at 5.)

In sum, the District recommended W.H.'s program in accordance with the IDEA's least restrictive environment requirements; W.H. was progressing at CHS, and there is no evidence that he would not continue to progress at CHS such that a residential facility was required for him to receive educational benefits.

## VI. Conclusion

The Court appreciates and understands parents' advocacy on behalf of their children; however, under the law, a school district is required to provide an "appropriate education, not one that provides everything that might be thought desirable by loving parents." *Walczak*, 142 F.3d at 132. In this case, a preponderance of the evidence shows that the 2008-09 IEP was appropriate. There were no procedural errors in the creation of the IEP that resulted in a denial of a free appropriate education. Substantively, the District's proposed program was tailored to meet W.H.'s unique needs and was reasonably calculated to enable W.H. to receive educational benefits. *See Cerra v. Pawling Cent. School Dist.*, 427 F.3d 186, 195 (2d Cir. 2005). The Court therefore grants the District's motion for summary judgment and denies S.H.'s motion for summary judgment. The Clerk of the Court is directed to close this case.

**The Clerk of Court is directed to close this case. Any pending motions are moot.**

SO ORDERED

Dated:    New York, New York
          December 8
                    , 2011


                                    Kimba M. Wood
                                    United States District Judge

24